# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | **02 C 1188** | **DATE** | Oct. 23, 2002 |
| **CASE TITLE** | Riggs Partners v Hub Group, Inc., et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☒ Status hearing held and continued to 11/26/02, at 9:00 a.m.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ☒ [Other docket entry] Memorandum opinion and order entered. Accordingly, this court grants Hub Group's and Andersen's motions to dismiss without prejudice, and grants plaintiff leave to file an amended complaint on or before 11/22/02.

(11) ☒ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | Document Number |
| X | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | OCT 25 2002 | date docketed | 32 |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | | |
| | GDS | courtroom deputy's initials | | date mailed notice | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

OCT 2 5 2002

RIGGS PARTNERS, LLC, and DAVID T.    )
ATKINS, on behalf of themselves and all others    )
similarly situated,    )
   )
   )
   Plaintiffs,    )
   )
   )   No.   02 C 1188
   v.    )
   )   Judge Robert W. Gettleman
HUB GROUP, INC., PHILIP C. YEAGER, JAY E. )
PARKER, DAVID P. YEAGER, THOMAS L.    )
HARDIN and ARTHUR ANDERSEN, LLP,    )
   )
   Defendants.    )

## MEMORANDUM OPINION AND ORDER

In the wake of an announcement by Hub Group, Inc. ("Hub Group") that it had overstated
its earnings in 1999 and 2000, plaintiffs Riggs Partners, LLC and David T. Atkins filed an amended
class action complaint against Hub Group, its auditor Arthur Andersen, LLP ("Andersen"), and
various current or former officers of Hub Group (the "individual defendants"). In Count I, plaintiffs
assert that defendants committed fraud in violation of § 10(b) of the Securities Exchange Act of
1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 . Count
II alleges a violation of § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), against
individual defendants.

In separate motions to dismiss, Hub Group (on behalf of itself as well as the individual
defendants) and Andersen contend that plaintiffs have not satisfactorily alleged scienter under the
pleading standards established by Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform

32

Act of 1995, and thus failed to state a claim under Rule 10b-5.[1] Andersen further contends that plaintiffs' claims against it are barred as to purchases of Hub Group stock made prior to March 29, 2000, the date on which Andersen filed its 1999 audit report with the SEC. For the reasons discussed below, both Hub Group's and Andersen's motions to dismiss are granted.

## BACKGROUND

The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to rule on its merits. See Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990). When considering the motion, the court accepts the allegations of the complaint as true and views the facts in the light most favorable to plaintiffs. Travel All Over the World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1428 (7th Cir. 1996).

In distilling the factual background of the instant dispute, the court is not limited merely to the allegations in the complaint, however. Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are both central to the plaintiff's claim and referenced in the complaint. Venture Associates Corp. v. Zenith Data Systems Corp., 987 F.2d 429, 431 (7th Cir. 1993). Moreover, the court may take judicial notice of documents filed with the SEC for the purpose of showing what statements the documents contain, but not for the proof of the facts stated therein. See Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1276-1281 (11th Cir. 1999) ("[W]e hold that a court, when considering a motion to dismiss in a securities fraud case, may take judicial notice (for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents) of relevant public documents

---

[1] The individual defendants maintain that plaintiffs' failure to state a claim under Rule 10b-5 eviscerates the § 20(a) claims in Count II.

required to be filed with the SEC, and actually filed."); Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991) ("It is highly impractical and inconsistent with Fed.R.Evid. 201 to preclude a district court from considering [SEC documents] when faced with a motion to dismiss a securities action based on allegations of material misrepresentations or omissions.... [T]he documents are the very documents that are alleged to contain the various misrepresentations or omissions and are relevant not to prove the truth of their contents but only to determine what the documents stated.").

Hub Group is a Delaware corporation headquartered in Lombard, Illinois, which offers intermodal,[2] truck brokerage, and comprehensive logistics services through a nationwide network of 29 offices, or "hubs." Hub Group completed its initial public offering in 1996, and in 1997 acquired a 65% ownership interest in Hub Group Distribution Services ("HGDS"). HGDS performs numerous logistical activities, including the installation, maintenance, and service of vendors' retail displays.[3] Alleged accounting improprieties concerning HGDS, which were incorporated into the financial statements of Hub Group over a three-year period, gave rise to the instant dispute.

According to plaintiffs, both of whom purchased Hub Group securities between April 21, 1999, and February 12, 2002 (the "class period"), defendants overstated HGDS' revenue in an

---

[2]Intermodal transportation involves shipping by containers which can travel by sea, on land, hitched to an 18-wheel cab, or by rail on a flat-bedded rail truck.

[3]In at least two Hub Group press releases cited in the complaint, Hub Group distinguishes HGDS from its supply chain logistics business. For example, an October 22, 2001, press release stated in pertinent part: "The two components of logistics, Hub Group Distribution Services and the Company's supply chain logistics services, reported a 4.6% revenue decline and a 31.8% revenue increase, respectively."

3

effort to sell HGDS for $65 million, which is more than half of Hub Group's market capitalization. Hub Group's letter of intent to sell its interest in HGDS, signed on March 13, 2000, was terminated shortly thereafter, and this fact was subsequently disclosed in Hub Group's 10Q for the next quarter ending June 30, 2000.

Plaintiff alleges that accounting improprieties and inadequate controls were pervasive at Hub Group, and not limited solely to misstatements of HGDS' revenue:

> According to former employees, often there was great confusion as to how much money was coming in and how much was going out and as to whether various units were making a profit. According to a witness with knowledge of the relevant facts, by February of 1999, it was clear that there were no internal controls whatsoever at the [Hub Group]. Prior to and throughout the Class Period, it was widely recognized within Hub Group that [it] was having enormous problems collecting its accounts receivable. For example, at any given time, the subsidiary had millions of dollars of open receivables that were 90, 120, 160 days old.... HGDS's accounts receivables were so disorganized that the subsidiary would not even try to collect money for its services for months on end, often after customers had complained about the lack of an invoice.... The failure to implement internal controls was consistent throughout the company. According to former employees, the multiple Hubs throughout the Class Period completely failed to reconcile their accounts on an ongoing basis. Hub Group's senior management did not reconcile the balance sheet and other accounts, but instead simply scanned the numbers to see if they seemed reasonable. In addition, for much of the Class Period, there were no inventory control procedures in place at HGDS.

Moreover, plaintiffs maintain that these alleged improprieties were well-known by Hub Group management:

> According to a former Hub Group employee, the Hub Group management, including the individual defendants, was specifically aware that the revenues reported to the SEC by HGDS were inaccurate and overstated. This fact was evidenced by the fact that Hub Group's centralized accounting functions generated a computer generated sheet entitled "Cash Forecast" which was updated daily and posted at the corporate office, ranking the different Hub Group subsidiaries by their cash on hand. These posted reports informed the management at Hub Group that HGDS was not collecting money from its customers. Around headquarters, as a result of the Cash Forecast reports, employees joked that HGDS never made any money, despite the published information to the contrary.

4

Plaintiffs further allege that Cindy Bee, a Hub Group employee, was responsible for monitoring HGDS' accounting and reporting to Hub Group management, and that senior management was furnished with information regarding accounts receivables, age of outstanding receivables, and credit sales.

In early 2001, Hub Group installed a new Transactional Processing System (TPS), which was designed to centralize all rail billing, accounting and trace reporting. According to plaintiffs, all accounting was done at central headquarters after the 2001 installation of TPS.

At all times during the class period, Andersen served as Hub Group's auditor. To this end, Andersen's responsibilities included testing of selected transactions, period-end adjusting entries and account analysis, and inquiry and discussion with senior management regarding current and prior period accounting issues, as well as internal controls. Andersen issued unqualified audit opinions with respect to Hub Group's 1999 and 2000 10K's, asserting that the consolidated financial statements fairly presented Hub Group's financial position, in conformity with generally accepted accounting principles (GAAP). These opinions were filed with the SEC on March 29, 2000, and March 15, 2001. Plaintiffs allege that, in conducting these audits, Andersen violated numerous generally accepted auditing standards (GAAS).[4]

In December 2001, Hub Group underwent an audit to reconcile previously unreconciled intercompany accounts, cash, accounts receivable, fixed assets, and accounts payable. According

---

[4]In Reiger v. Price Waterhouse Coopers LLP, 117 F. Supp. 2d 1003, 1009 (S.D.Cal. 2000), the court articulated the difference between GAAP and GAAS as follows: "Generally accepted accounting principles ('GAAP') comprise a set of basic postulates and broad accounting principles pertaining to business enterprises. These principles... establish guidelines for measuring, recording and classifying the transactions of a business entity. Generally accepted auditing standards ('GAAS') embody the general standards... for the conduct of auditors in the performance of an examination." (Citations omitted.)

to one employee, prior to the audit, Hub Group had not required its field accountants to do reconciliations of the balance sheet accounts.

On February 12, 2002, Hub Group announced that it had "discovered certain accounting irregularities at [HGDS]... [and] estimates that due to these irregularities the Company overstated its earnings on an after-tax, post minority interest basis by between approximately $3.0 million to $4.0 million in total over a multi-year period." The relevant press release also included statements tending to distance HGDS from Hub Group:

> Throughout the years in question, HGDS maintained its own office space, information technology systems and accounting software. Unlike the Company's other subsidiaries which are all wholly-owned and which centralized their accounting functions in Lombard in 2001, HGDS maintains its own accounting departments. The HGDS accounting department regularly reported its financial results to the Company, who then incorporated these results into its financial reports.

After this announcement, Hub Group's common stock price dropped from $10.52 per share to $8.03 per share, a one-day loss of more than 31% on volume of more than 153,700 shares traded, which is more than ten times the average trading volume.

Hub Group was required to restate its financial statements for 1999 and 2000 because those statements had not been prepared in conformity with GAAP and SEC requirements when they were issued. Ultimately, Hub Group adjusted its 1999 net income downward 13% (from $10.846 million to $9.405 million), and its 2000 net income downward 42% (from $4.617 million to $2.683 million),[5] and the instant suit ensued.

---

[5]Operating costs for 1999 and 2000 were revised upward by $2.4 million and $3.4 million, respectively. Further, accounts receivable for 1999 and 2000 were revised downward by $1.3 million and $2.7 million, respectively, and accounts payable were revised upward by $2.0 million in 1999 and $5.9 million in 2000.

## ANALYSIS

To state a claim for securities fraud under Rule 10b-5, the plaintiff must allege that the defendant, (1) made a misstatement or omission, (2) of a material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that reliance proximately caused plaintiff's injuries. In re HealthCare Compare Corp. Sec. Litig., 75 F.3d 276, 280 (7th Cir. 1996). The scienter requirement for a Rule 10b-5 claim has been defined as a "mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193, n.12, 96 S.Ct. 1375 (1976).

Because Rule 10b-5 claims necessarily allege fraud, the heightened pleading standards embodied in Federal Rule of Civil Procedure 9(b) apply, thus requiring the plaintiff to plead the circumstances constituting fraud with particularity. According to the Seventh Circuit, "this means the who, what, when, where, and how: the first paragraph of any newspaper story." DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990).

Moreover, the Private Securities Litigation Reform Act of 1995 (PSLRA) requires plaintiffs seeking relief under Rule 10b-5 to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Although the Seventh Circuit has not yet articulated what types of facts give rise to an inference of scienter, a majority of courts, especially in this District, have adopted the standard espoused by the Second Circuit. See Lindelow v. Hill, No. 00-C3727, 2001 WL 830956, at *6 (N.D.Ill. July 20, 2001). Under the Second Circuit's test, a plaintiff may meet its burden by alleging either, (1) facts showing the defendants had both motive and opportunity to commit fraud, or (2) facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. Id. In this

7

context, recklessness requires proof that the defendant's conduct was "highly unreasonable" and involved "an extreme departure from the standards of ordinary care... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Danis v. USN Communications, Inc., 73 F. Supp. 2d 923, 938 (N.D.Ill. 1997). Moreover, in determining whether a strong inference of scienter has been established, "a court should not consider each relevant factual allegation solely in isolation... but rather, as a part of the overall factual picture painted by the complaint." In re Microstrategy, Inc. Sec. Litig., 115 F. Supp. 2d 620, 631 (E.D.Va. 2000).

In separate motions to dismiss, Hub Group and Andersen each contend that plaintiff has failed to satisfactorily allege scienter[6] under the foregoing pleading standards. Because the factual allegations that purportedly establish scienter with respect to each defendant focus on different activities, the court will examine each motion separately.

Hub Group's Motion to Dismiss

Plaintiffs assert two bases for demonstrating a "strong inference" of scienter with respect to Hub Group and the individual defendants, as required by the PSLRA. First, plaintiffs argue that the complaint alleges strong circumstantial evidence of conscious misbehavior or recklessness, in part because Hub Group monitored HGDS' financial reporting and thus knew of inaccuracies in its statements. Plaintiffs further allege that management knew both that reconciliations were not done and there were inadequate internal controls throughout Hub Group.

---

[6]Neither Andersen nor Hub Group disputes that plaintiffs have adequately pled the other elements of their Rule 10b-5 claims.

Second, plaintiffs assert that the potential $65 million sale of HGDS provided Hub Group with a motive to misstate its financial results during the class period.

In response, Hub Group and the individual defendants dispute plaintiffs' allegations of conscious misbehavior or recklessness, contending that "plaintiffs have not alleged any facts to explain why it is reasonable to assume that [Hub Group executives] who were managing a multi-billion dollar business must have been aware of accounting minutiae at a partially-owned subsidiary that contributed less than 8% of its annual revenues." With respect to plaintiffs' allegations regarding motive and opportunity, Hub Group asserts that the proposed sale of HGDS fell through less than two months after the letter of intent was signed, and that plaintiffs have failed to articulate any other conceivable motive for Hub Group to inflate HGDS' financial results for the remaining eighteen months of the class period.[7] The individual defendants further maintain that, because plaintiffs failed to state a claim against Hub Group, the control person liability claims under § 20(a) of the Securities Exchange Act of 1934 against the individual defendants necessarily fail, as well.

The court concludes that plaintiffs' allegations with respect to conscious misbehavior or recklessness, as well as motive and opportunity, are insufficient to withstand Hub Group's 12(b)(6) motion to dismiss. The relatively minor adjustments to the financial misstatements, combined with the vagueness of plaintiffs' allegations regarding the individual defendants'

---

[7] Hub Group also urges the court to take judicial notice of stock purchases made by individual defendants as evidence tending to refute any motive to artificially inflate stock prices. The court declines to take judicial notice of those purchases, however. Moreover, even if the court were to consider those purchases, it would not alter the conclusion that plaintiffs have not met their burden at this stage of the litigation.

9

knowledge of inadequate internal controls, does not establish a strong inference of scienter and therefore does not state a claim under Rule 10b-5.

Violations of accounting standards are generally insufficient, standing alone, to create a strong inference of scienter. Gcinko v. Padda, No. 00-C5070, 2001 WL 1163728, at *4 (N.D.Ill. Sept. 28, 2001); In re Allied Products Corp., Inc. Sec. Litig., No. 99-C3597, 2000 U.S. Dist. LEXIS 16781, at *10. Nonetheless, the magnitude and nature of accounting errors may belie a defendant's claim that it was unaware of any improprieties. For example, in Rehm v. Eagle Finance Corp., 954 F. Supp. 1246, 1256 (N.D.Ill. 1997), Judge Moran concluded that the plaintiff had adequately alleged scienter in part by noting that "the more serious the error, the less believable are defendants' protests that they were completely unaware of [the company's] true financial status and the stronger is the inference that defendants must have known about the discrepancy." See also Chu v. Sabratek Corp., 100 F. Supp. 2d 827, 839-840 (N.D.Ill. 2000) (finding strong inference of recklessness when defendants improperly accounted for intangible assets, resulting in overstatement of earnings by $39 million); Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000) (finding strong inference of recklessness when restatement of expenses led to operational loss of $25 million in one year).

In the instant case, the restatement of Hub Group's net income in 1999 and 2000 involved substantial downward revisions: 13% in 1999 and 42% in 2000. Hub Group points out in its motion to dismiss, however, that the adjustments to revenue were less substantial. For example, the 2002 restatement "caused Hub Group's total 2000 revenue to be reduced by only $1.5 million, which is less than one-tenth of one percent of the Company's total revenues for the year

of $1.383 billion... and approximately <u>one percent</u> of HGDS' $110 million in revenues reported in 2000." (Emphasis in original.)

Moreover, according to Hub Group's press release, which was quoted in the complaint, HGDS' accounting functions were always maintained separately from the other Hub Group subsidiaries, such that any accounting irregularities are attributable to HGDS alone, rather than the recklessness of Hub Group management.[8] As support for its position, Hub Group cites <u>Chill v. General Electric</u>, 101 F.3d 263 (2d Cir. 1996), which it maintains is virtually indistinguishable from the instant case.

In <u>Chill</u>, the Second Circuit upheld the district court's 12(b)(6) dismissal of a securities fraud action against General Electric (GE), due to the plaintiffs' failure to adequately plead scienter. <u>Id.</u> at 266. That case arose when GE incorporated financial misstatements from Kidder, Peabody & Co. (Kidder), one of twenty-four businesses comprising GE Capital (which, in turn, is one of General Electric's twelve major, separately managed businesses). These misstatements involved a scheme of "phantom" trades by an employee at Kidder, which resulted in a $350 million overstatement of profits between late 1991 and March 1994. <u>Id.</u> In upholding the district court, the Second Circuit noted that fraud cannot be inferred "simply because GE might have been more curious or concerned about the activity at Kidder," and concluded that recklessness cannot be presumed from a parent company's reliance on its subsidiary's internal controls. <u>Id.</u> at 270-271.

---

[8]The court notes that Hub Group's public attempts to distance itself from HGDS arose <u>after</u> its acknowledgment of accounting irregularities, not before.

Although Chill is not binding authority on this court, its reasoning is nonetheless persuasive. In the instant case, Hub Group owns 65% of HGDS, which performs niche logistics services on behalf of Hub Group's intermodal clients. Although the magnitude of the downward revisions of net income in the instant case are indeed substantial – 13% in 1999 and 42% in 2000 – and belie Hub Group's characterization of HGDS as a stand-alone, inconsequential subsidiary, the court cannot conclude that management must have, or should have, recognized the accounting errors at issue. Indeed, in the instant case, the actual adjustments to accounts receivable, accounts payable and total shareholder's equity were considerably smaller than those alleged in Chill. In the Hub Group's restatement for 1999, for example, accounts receivable were reduced by 0.7%, accounts payable were increased by 1.4%, and total shareholder's equity was reduced by 1.0%. Though not insubstantial, these figures do not suggest that management's conduct was "highly unreasonable" or involved "an extreme departure from the standards of ordinary care... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Danis, 73 F. Supp. 2d at 938.

Plaintiffs have also alleged a pervasive lack of controls throughout Hub Group, presumably to bolster their claims that management was reckless in allowing, or perhaps not detecting, the accounting irregularities at issue.[9] To this end, plaintiffs provide vague allegations regarding management's knowledge of improprieties with inventory and accounts receivable, seemingly conflating HGDS and Hub Group throughout the complaint. For example, at one point, plaintiffs allege, "[I]t was widely recognized within Hub Group that the Company [Hub

_____

[9]Plaintiffs also allege that HGDS' cash forecasts suggested that it was not making any money. The court notes, however, that cash forecasts are distinct from revenues, and that a company may indeed post significant revenues without being awash in cash.

Group] was having enormous problems collecting its accounts receivable. For example, at any given time, the subsidiary had millions of dollars of open receivables that were 90, 120, 160 days old." (Emphasis added.) Moreover, although the crux of plaintiff's complaint is that HGDS' revenues, as reported by Hub Group to the SEC, were materially overstated, plaintiffs nonetheless allege that the "Hub Group management, including the individual defendants, was specifically aware that the revenues reported to the SEC by HGDS were inaccurate and overstated."[10] (Emphasis added.)

Plaintiffs also fail to distinguish adequately between HGDS and the "hubs." At one point in the complaint, plaintiffs cite to a "monthly metrics reporting package which ranked the 'Hubs' in terms of performance" as evidence of management's knowledge regarding HGDS' finances, notwithstanding the fact that HGDS was not "hub" but rather was a stand-alone subsidiary engaged in a distinct line of business. Plaintiffs' allegations regarding the centralized accounting of Hub Group's subsidiaries are similarly deficient. For example, as confirmation of "centralized control of management over Hub Group's various divisions and subsidiaries," plaintiffs cite an article published on the University of Chicago's Graduate School of Business website during the winter of 2000, which stated that "David Yeager [MBA '97] just completed a five year

---

[10]The court also notes that the source of this statement was "a former Hub Group employee." Although plaintiffs are entitled to plead upon information and belief, the court is troubled by plaintiffs' failure to identify the source of this allegation, as well as others, with greater particularity. See Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000) (finding that heightened pleading requirements of PSLRA are satisfied when allegations in complaint are based on either adequate documentary evidence or personal sources who are identified with sufficient detail "to support the probability that a person in the position occupied by the source would possess the information alleged").

13

consolidation of the Hub Group, turning a loosely connected network of 35 independent branches into a more tightly controlled system managed at company headquarters." Four pages later in the complaint, however, plaintiffs contradict this allegation by quoting the following language from Hub Group's February 12, 2002, press release, which belies their earlier allegations regarding Hub Group's centralization of HGDS' accounting:

> Throughout the years in question, HGDS maintained its own office space, information technology systems and accounting software. <u>Unlike the Company's other subsidiaries</u> which are all wholly owned and which centralized their accounting function in Lombard in 2001, HGDS maintains its own accounting department. The HGDS accounting department regularly reported its financial results to the Company, who then incorporated these results into its financial reports. [Emphasis added.]

Plaintiffs' failure to adequately distinguish between Hub Group, its "hubs," and HGDS undermines the court's ability to decipher the contours of plaintiffs' allegations, and prevents the court from finding a strong inference of scienter on the part of Hub Group with respect to its overstatement of HGDS' revenues. Of course, the court recognizes that plaintiffs in a securities class action are constrained by an obvious inability to access underlying information that is uniquely and exclusively within the possession of defendants. See, e.g., In re First Merchants Sec. Litig., No. 97-C2715, 1998 U.S. Dist. LEXIS 17760, at *22 (N.D.Ill. November 2, 1998) ("The fact that Plaintiffs do not have all of the specific documents to support their claims at this time is not fatal to their complaint."). Nonetheless, the factual allegations asserted by plaintiffs in the instant case are simply too vague and conclusory to convince this court that plaintiffs have established a strong inference of scienter, based on circumstantial evidence of conscious misbehavior or recklessness.

14

Plaintiffs' allegations regarding opportunity and motive are similarly unavailing. Plaintiffs allege that Hub Group's plan to sell HGDS for $65 million, which is more than one-half of Hub Group's market capitalization, motivated management to misstate HGDS' revenues. The plaintiffs do not dispute, however, that within two months of signing the letter of intent, Hub Group terminated its plan to execute the sale. This fact was promptly disclosed in Hub Group's next 10Q, and plaintiffs have not alleged that Hub Group contemplated subsequent sales or courted other purchasers at any other point during the class period. Moreover, as stated earlier, Hub Group readily conceded in press releases during the relevant time period that HGDS' revenues were down, thus belying a strong inference that Hub Group intended to dupe potential acquirers.

Because the defects in the complaint discussed above lead the court to conclude that plaintiffs have failed to adequately plead recklessness or motive and opportunity that would provide a strong inference of Hub Group's scienter under the PSLRA, Hub Group's 12(b)(6) motion to dismiss is granted without prejudice. Moreover, because Rule 10(b)-5 liability is a predicate to § 20(a) liability, see, e.g., Geinko, 2001 WL 1163728, at *9, the latter claims against individual defendants must also be dismissed.

Andersen's Motion to Dismiss

According to plaintiffs, in its audit of Hub Group, "Andersen persistently refused to see the obvious, to investigate the doubtful, and its accounting judgments were such that no reasonable accountant would have made the same decisions if confronted with the same facts." More specifically, plaintiffs allege that Andersen violated GAAS because it "knew or recklessly disregarded the existence of a variety of material weaknesses in [Hub Group's] internal controls

15

but failed to quantify the severity of those weaknesses." Plaintiffs contend that these GAAS violations, taken together with several "red flags" that signaled inadequate controls at Hub Group, provide a strong inference of scienter that is sufficient to withstand Andersen's 12(b)(6) motion.

In response, Andersen maintains that plaintiffs have failed to plead with sufficient particularity the facts giving rise to Andersen's alleged recklessness. To the extent that the complaint attributes knowledge of "red flags" to the defendants, Andersen maintains that such knowledge was attributed solely to Hub Group management, not Andersen. The crux of Andersen's argument is that alleged malfeasance by Hub Group management should not be imputed to Andersen simply because it was Hub Group's auditor. Morever, Andersen contends that to the extent plaintiffs have adequately alleged scienter, plaintiffs' claims against it are barred as to purchases of Hub Group stock made before March 29, 2000, the date on which Andersen filed its unqualified audit opinion with the SEC (as part of Hub Group's 1999 10-K).[11]

For the reasons discussed below, the court concludes that plaintiffs have not adequately pled scienter and grants Andersen's motion to dismiss.

As noted above, in the context of securities fraud, recklessness requires proof that the defendant's conduct was "highly unreasonable" and involved "an extreme departure from the standards of ordinary care... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Danis, 73 F. Supp. 2d at 938 (N.D.Ill. 1997). As applied specifically to outside auditors, this requirement has been interpreted to mean

---

[11] In their response to Andersen's motion to dismiss, plaintiffs did not address the latter argument.

that "the accounting practices amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." First Merchants, 1998 U.S. Dist. LEXIS 17760, at * 29 (citations omitted).

Allegations of GAAP and GAAS violations, standing alone, are generally insufficient to meet this higher pleading standard. Nonetheless, such violations are relevant to prove scienter when the complaint also identifies "red flags," or specific, highly suspicious facts and circumstances available to the auditor at the time of the audit, and alleges that these facts were ignored, either deliberately or recklessly. See, e.g., In re SmarTalk Teleservices Sec. Litig., 124 F. Supp. 2d 505, 515 (S.D.Ohio 2000).

Applying this higher standard, some courts have concluded that "the failure of a non-fiduciary accounting firm to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b) liability." Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000). See also Reiger, 117 F. Supp. 2d at 1009, n.5 (allegation that the audited company had weak internal accounting controls was a "boilerplate" red flag, present in almost every securities fraud action, and did not meet particularity and strong inference requirements of PSLRA).

The court finds that the inadequate internal control mechanisms and lack of reconciliations repeatedly emphasized by plaintiffs fail to meet this higher pleading standard. Plaintiffs have merely alleged a number of GAAS and GAAP violations, without identifying any red flags that would suggest that Andersen was indeed reckless. Further, as noted in the court's

17

discussion of Hub Group's motion to dismiss, the nature and magnitude of accounting errors at issue in the instant case are not so egregious as to merit a strong inference of recklessness.

To the extent that plaintiffs have provided any persuasive authority for their position, the court concludes that those cases are inapposite. For example, in Miller v. Material Sciences Corp., 9 F. Supp. 2d 925 (N.D.Ill. 1998), in which the defendant was the company itself, rather than an independent auditor, the plaintiffs alleged that an employee-controller artificially increased the value of the company's inventory and underreported accounts payable, thus inflating earnings. Id. at 927. In denying the defendant company's motion to dismiss for failure to adequately plead scienter, the court noted that the employee accused of falsely inflating inventory had previously received poor performance reviews, a controller at another division of the defendant company had engaged in similar misconduct before, and that discrepancies between inventory and financial documents were discussed repeatedly at quarterly business reviews. Id. at 928.

For a number of reasons, the instant case is distinguishable from Miller. First, and most important, Miller did not involve an independent auditor as the defendant. As noted in Reiger, an independent accountant's relationship with his client "does not impute the accountant with knowledge of every idiosyncratic detail associated with the client's business." Reiger, 117 F. Supp. 2d at 1009. Moreover, the allegations of red flags in Miller were far more specific, and hence suspicious, than anything alluded to by the plaintiffs in the instant case. Miller did not involve simply a misapplication of accounting principles, but rather significant discrepancies that were identified and discussed at length, on more than one occasion.

18

Plaintiffs' reliance on In re Oxford Health Plans, Inc. Sec. Litig., 51 F. Supp. 2d 290 (S.D.N.Y. 1999), is also misplaced. In Oxford, the court denied the defendant auditor's motion to dismiss for failure to adequately plead scienter, finding a strong inference of recklessness with respect to its disregard of "extreme accounting irregularities, particularly Oxford's complete lack of internal controls and utterly ineffective computer system." Id. at 294. In reaching this conclusion, the court pointed to a number of "red flags," including the fact that an investigation of Oxford by the New York State Insurance Department found that Oxford's internal controls and accounting practices were deficient, resulting in a $3 million fine and a recommendation that the two leaders of the auditing team be removed. Id. at 295. Plaintiffs' characterization of the instant case as "analogous" is entirely without merit.

Indeed, in most cases in which courts have been willing to find a strong inference of scienter, the plaintiffs have pointed to far more suspicious circumstances than those alleged here, and often included allegations that the defendant accountant had reason to know of the accounting irregularities. See, e.g., Danis, 73 F. Supp. 2d at 942 (finding inference of recklessness when auditor was "brought on specifically to evaluate [company's] internal accounting and billing controls and to design a system for their improvement"); Retsky v. Price Waterhouse, 1998 WL 774678, at *10 (N.D.Ill. Oct. 21, 1998) (finding strong inference of scienter when plaintiff alleged that "the accounting firm was aware of the financial irregularities in each contract, noted in each case the GAAP which barred revenue recognition, and specifically concluded in at least one case that the premature revenue recognition ultimately taken was inappropriate"). The allegations in the instant case are simply insufficient to give rise to a strong inference of scienter.

19

For the foregoing reasons, the court concludes that plaintiffs have not pled scienter against Andersen with sufficient particularity to withstand the instant 12(b)(6) motion to dismiss. Thus, Andersen's 12(b)(6) motion to dismiss is granted without prejudice.

## CONCLUSION

For the foregoing reasons, the court grants Hub Group's and Andersen's motions to dismiss without prejudice, and grants plaintiff leave to file an amended complaint on or before November 22, 2002. This matter is set for a report on status November 26, 2002 at 9:00 a.m.

**ENTER:**     **October 23, 2002**

**Robert W. Gettleman**
**United States District Judge**

20